Filed 11/6/13  P. v. Ceballos CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>　　v.<br><br>ERIC CEBALLOS et al.,<br><br>　　　　Defendants and Appellants. | B240172<br><br>(Los Angeles County<br>Super. Ct. No. BA343972) |

APPEAL from judgments of the Superior Court of Los Angeles County, Sam Ohta, Judge.  Affirmed as modified.

Steven Schorr, under appointment by the Court of Appeal, for Defendant and Appellant Eric Ceballos.

Lawrence R. Young for Defendant and Appellant Cesar Ortega.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Victoria B. Wilson, Supervising Deputy Attorney General, Mark E. Weber, Deputy Attorney General, for Plaintiff and Respondent.

## INTRODUCTION

Defendants and appellants Eric Ceballos and Cesar Ortega were tried together before separate juries. Ceballos's jury found Ceballos guilty of first degree murder (Pen. Code, § 187, subd. (a)[1]), assault with a semiautomatic firearm (§ 245, subd. (b)), and shooting at an occupied motor vehicle (§ 246). The jury found true the allegation that Ceballos committed each of the offenses for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by gang members (§ 186.22, subd. (b) (gang enhancement allegation)); and the allegations that in the commission of the murder and shooting at an occupied motor vehicle offenses, a principal personally used a firearm (§ 12022.53, subds. (b) & (e)(1)), personally discharged a firearm (§ 12022.53, subds. (c) & (e)(1)), and personally discharged a firearm proximately causing great bodily injury or death (§12022.53, subds. (d) & (e)(1)). Ortega's jury found Ortega guilty of first degree murder (§ 187, subd. (a)), attempted murder (§§ 664/187, subd. (a)), and shooting at an occupied motor vehicle (§ 246). As to all offenses, Ortega's jury found true a gang enhancement allegation (§ 186.22, subd. (b)), and the allegations that a principal personally used a firearm (§ 12022.53, subds. (b) & (e)(1)), personally discharged a firearm (§ 12022.53, subds. (c) & (e)(1)), and personally discharged a firearm proximately causing great bodily injury or death (§12022.53, subds. (d) & (e)(1)). The trial court sentenced Ceballos and Ortega to state prison terms of 97 years to life and 84 years to life respectively.

On appeal, defendants contend that the trial court erred in admitting photographs that showed them in the company of Toonerville gang members and in imposing sentence enhancements under section 12022.53, subdivisions (b) and (e)(1) and (c) and (e)(1) on their shooting at an occupied vehicle convictions. Ceballos further contends that the trial court erred in imposing a four-year section 186.22, subdivision (b)(1)(A) sentence enhancement on his assault with a semiautomatic firearm conviction. Ortega further

---

[1] All statutory citations are to the Penal Code unless otherwise noted.

contends that there was insufficient evidence to support his murder conviction; and the prosecution's expert witness testimony in support of the gang enhancement allegation was hearsay; and the admission of that testimony violated his constitutional right of confrontation. Ceballos and Ortega join each other's arguments. Respondent states that Ceballos should have been awarded two additional days of custody credit and Ortega should have been awarded six additional days. We order defendants' abstracts of judgment modified by striking the section 12022.53, subdivisions (b) and (e)(1) and (c) and (e)(1) sentence enhancements on their shooting at an occupied vehicle convictions. We further order Ceballos's abstract of judgment modified to reflect 1,325 days of custody credit, and Ortega's abstract of judgment modified to reflect 1,301 days of custody credit. The judgments otherwise are affirmed.

## BACKGROUND[2]

### I. Evidence Presented to Both Juries

#### A. *The Shootings*

On February 14, 2008, Martha Hosie and her girlfriends, including Claudia Ledezma, were at Hosie's house. At some point, Hosie drove Ledezma to Steve Garcia's house in the Atwater area. After midnight, Garcia drove Hosie and Ledezma to a local bar where they remained until about 2:00 a.m. When they left the bar, Garcia was driving, Ledezma was sitting in the front passenger seat, and Hosie was sitting in the back seat behind Ledezma.

As they drove, Garcia turned onto Carillon Street in Atwater Village, coming to a stop in the 2700 block. Two men approached the car from the passenger side. One man

---

[2]    As noted above, the charges against Ceballos and Ortega were tried to separate juries. Certain evidence was presented only to Ceballos's jury and other evidence was presented only to Ortega's jury. Respondent's brief failed to segregate such testimony. Ceballos moved this court to strike or disregard evidence presented only to Ortega's jury in resolving Ceballos's appeal. Respondent submitted a letter brief acknowledging and correcting its error. We grant Ceballos's motion to the extent that we disregard evidence presented only to Ortega's jury in resolving Ceballos's appeal. Likewise, we do not consider evidence presented only to Ceballos's jury in resolving Ortega's appeal.

3

stood directly next to Ledezma's door.  Hosie believed that the second man stood two steps to the left and five or six steps behind the man next to Ledezma's door.  Ledezma believed that the second man stood to the right of the man next to Ledezma's door, close to the car.  Ledezma described the man in front as being no more than five feet, nine inches tall and stocky.  He was wearing a white shirt, a "hoodie," and a blue hat that he wore backwards.

The man in front tapped on Ledezma's window with a gun that appeared to be a semiautomatic firearm.  Hosie heard the man ask, "Where are you from, homey?"  At trial, Ledezma identified Ceballos as the man who tapped on her window with the gun.  She testified that she got a good look at the man standing next to Ceballos and he was not in the courtroom.  The inquiry, "Where are you from" is a common phrase gang members use to challenge a gang member from another territory or to determine a person's gang membership.  After the inquiry, Hosie heard multiple gunshots.  Ledezma did not hear Ceballos say anything, but heard a series of gunshots after Ceballos tapped on the window.  According to Ledezma, Ceballos reached into the car and fired his gun.

Hosie yelled to Garcia to "drive."  Garcia tried to drive away but crashed into a light pole.  Ledezma heard additional gunshots after the car crashed, and saw Ceballos and the second man run to a car and drive away.  Ceballos's hat fell off as he ran to the car.

Ledezma got out of the car and called 911.  The 911 operator asked Ledezma her location.  Because she did not know, Ledezma walked to the next street to read the street sign.  Ledezma gave the 911 operator her location and returned to Garcia's car where she determined that she had been shot in the left elbow.  Ledezma's gunshot wound required two surgeries and left her with a 12-inch scar.  Garcia sustained fatal gunshot wounds.

About 3:00 a.m. on February 15, 2008, an Hispanic man entered the Pacifica Hospital emergency room with a gunshot wound to his neck.  The man told a security guard that he had a friend in a car who needed help.  The security guard went outside with a wheelchair and assisted the man into the hospital.  The security guard could not remember the nature of that man's injuries.  Around 3:00 a.m. on February 15, 2008, Los

4

Angeles Police Officer Randy Blandford responded to a call at the Pacifica Hospital about two shooting victims. Officer Blandford identified Ceballos and Ortega as the shooting victims.

Los Angeles Police Department officers responded to the scene of Garcia's shooting. In their investigation, they determined that both sides of Garcia's car had multiple bullet strikes from different angles. There were several bullet strikes on the driver's door, and both driver's side windows were smashed. The windshield had multiple bullet holes, most of which were on the passenger side. The front passenger window was "partially" rolled down. In the street, officers found seven spent casings that appeared to have been from a nine-millimeter handgun, bullet fragments, a baseball hat, and a live "round" or bullet. They recovered two casings inside Garcia's car and one spent casing on the car near the windshield.

Los Angeles Police Department Firearms Analysis Unit Criminalist William Moore testified that of the spent casings recovered, eight were fired from the same nine-millimeter semiautomatic handgun. The live bullet that was recovered was cycled through a second nine-millimeter semiautomatic firearm. A spent casing also was fired from that second firearm. According to Moore, two bullets recovered from Garcia by the coroner, a bullet recovered from the driver's door, and a bullet found next to Garcia's body were fired from a .38-caliber revolver. A bullet recovered from Ledezma's elbow was "most consistent" with a .38- or .357-caliber bullet, and not with a nine-millimeter bullet. However, Ledezma's bodily fluids had eroded some of the bullet's "individualizing features" preventing further identification.

Moore was able to identify clearly three guns that were fired at the murder scene. With respect to two of the guns, and presumably as to the third gun, Moore testified that there was no way for him to determine whether they were at the crime scene that night. There was other bullet evidence that was fired from a fourth firearm, i.e., not from either of the identified nine-millimeter semiautomatic or the .38-caliber revolver handguns. Moore could not specifically identify additional other bullet evidence as having been

fired from a particular gun.  Assuming such evidence was produced by independent firearms, it was possible there were additional firearms at the murder scene.

Tests on the brim or sweatband of the hat recovered from the murder scene revealed DNA from at least two persons.  Ortega could have been the source of the DNA—one out of 10,000 persons has a DNA profile that could fit within the DNA mixture on the hat.  Ceballos was excluded as a DNA source.  Tests on a blood swab taken at the murder scene matched Ortega's DNA—one out of 100 trillion persons would match the blood sample.

Los Angeles County Coroner's Office Deputy Medical Examiner Dr. Ajay Panchal performed the autopsy on Garcia's body.  Dr. Panchal testified that Garcia suffered 15 gunshot wounds, four of which were fatal by themselves.  Four of the gunshot wounds entered the left side of Garcia's body with a left-to-right path.  Dr. Panchal recovered six bullets or bullet fragments in the autopsy.

In April 2008, Los Angeles Police Department Detective Harold DiCroce showed Ledezma a six-pack photographic lineup.  Ceballos's photograph was photograph No. 3.  Ledezma circled photograph Nos. 1 and 3, believing they could have been the man she saw holding the gun the night of Garcia's murder.  Detective DiCroce then left Ledezma alone in the interview room.  While Detective DiCroce was away, Ledezma took another look at the photographs and identified No. 3 as the person she saw.  When Detective DiCroce returned to the interview room, Ledezma did not tell him that she had identified photograph No. 3 and was excluding No. 1.  It did not occur to her to do so.  At trial, Ledezma testified that she was positive that Ceballos was one of the shooters.  She testified, "Facial features, or when you go to bed every night looking at that face over and over, you just know."

Detective DiCroce also showed Ledezma a six-pack photographic lineup containing Ortega's photograph.  Ledezma did not identify Ortega from the lineup.

6

*B.      The Gang Evidence*

Los Angeles Police Department Sergeant John Strasner, the prosecution's gang expert, testified that the primary activities of the Toonerville gang were drugs sales, assaults with deadly weapons, and murder.  On April 8, 2009, Toonerville gang member Patrick Evans was convicted of a murder committed on December 24, 2006.[3]  On March 7, 2008, Toonerville gang member Assael Aguirre was convicted of a murder, an attempted murder, and a shooting at an occupied vehicle committed on April 24, 2006.

Sergeant Strasner testified that the Rascals and Toonerville gangs were rivals with a history of violent crimes against each other that included assaults, shootings, and murders.  Garcia was a member of the Rascals gang.  Ceballos and Ortega were members of the Toonerville gang.  The territories of the Rascals and Toonerville gangs bordered one another.  The location of Garcia's and Ledezma's shooting was "very, very deep" in Rascals territory.  Sergeant Strasner opined that a hypothetical shooting by a gang member based on facts similar to this case would have been committed for the furtherance of the gang.

According to Sergeant Strasner, Danny Huerta was a Toonerville gang member. On February 16, 2008, the day after Garcia's murder, Sergeant Strasner, responding to a call concerning an armed person selling narcotics, saw Huerta throw a handgun inside the trunk of a red Geo Storm.  The car was registered to Maricela Serna Garcia, mother of Toonerville gang member Gabriel Serna.[4]  The police searched the car and found, among other handguns, a .38-caliber revolver in the glove box.  Two of the bullets recovered from Garcia during his autopsy, the bullet found in the driver's door, and the bullet found next to Garcia's body were fired from that .38-caliber revolver.  According to Sergeant

---

[3]      Sergeant Strasner also inconsistently testified that Evans was charged with murder on or about December 24, 2006.

[4]      The jury was shown a photograph of Ceballos, Ortega, Serna, and another photograph of Ceballos, Ortega, Serna, and Huerta.

Strasner, commonly, a gang member who has used a gun to commit some kind of act will pass the gun to another gang member.

## II.     Evidence Presented Only to Ortega's Jury

On February 14, 2008, Lindsay Lilburn and her fiancé Richard Clayborn were at Ortega's apartment. Clayborn was a Toonerville gang member. Ortega, Ceballos, "Joker," "Scooby," and Ortega's wife also were present at the apartment. At some point, Clayborn, Ortega, Ceballos, Joker, and Scooby had a conversation about going to "Trash"—a term used to refer to the Rascals gang's neighborhood. "They" attempted to convince Clayborn to go to "Trash"—Ortega asked Clayborn if he wanted to go to Trash. Clayborn declined. Ceballos was part of the conversation, but Lilburn did not remember anything specific that he said. She knew, however, that "he went." Lilburn wanted to go home, and Clayborn went with her. Lilburn and Clayborn lived "quite a distance" from Ortega's apartment. They left Ortega's apartment late in the evening. About two hours after they arrived home, Ortega called Lilburn and told her that he had been shot and thought he was paralyzed.

In October 2008, Clayborn was arrested. He was charged with murder in 2009. In an attempt to help Clayborn, Lilburn gave the police information about the "Valentine's Day" murder. Lilburn believed the police would release Clayborn if she cooperated. Lilburn was given immunity in the case against Clayborn. Lilburn testified that she did not lie to the police and was not lying on the stand. Lilburn admitted that she was a methamphetamine addict with a long history of drug arrests. She had been put into a drug treatment program following a recent arrest. Lilburn's drug use impaired her memory. She was drinking, but not using drugs on February 14, 2008.

Around 3:00 a.m. on February 15, 2008, Los Angeles Police Department Officer Keith Hopkins responded to a call at Pacifica Hospital about two shooting victims. There, he spoke with Ortega, one of the victims. Ortega had been shot in the abdomen. Ortega told Officer Hopkins that about an hour earlier, he was sitting on a bus stop bench near the intersection of San Fernando Road and Maclay Street when he was shot and fell

8

to the ground. Ortega did not see anything and did not remember anything else about the shooting. He told the officer that an unknown person in an unknown type of black vehicle took him to the hospital. Ortega was uncooperative in the investigation and appeared not to want to speak with Officer Hopkins. Officer Joseph Villagran went to the intersection of San Fernando Road and Maclay Street and was unable to find any evidence of a shooting such as casings, stray bullets, or blood.

On February 15, Detective DiCroce learned that two Toonerville gang members had been admitted to Pacifica Hospital about a half an hour after the shooting in Atwater Village. On February 17, Detective DiCroce interviewed Ortega at Northridge Hospital, to which Ortega had been transferred. At first, Ortega stood by the story he previously had told the police, i.e., that he had been by himself when he was shot at Maclay and San Fernando Road and he was taken to the hospital by an unknown person. Detective DiCroce pressed Ortega, telling him that his story did not make sense—that he was shot at one location, a car picked him up, and a second gang member who also had been shot at a different location was in the car. Ortega continued to claim that he had been shot at Maclay and San Fernando Road, but added that Ceballos had been with him. Ortega explained that he did not want to get in trouble with his girlfriend—he and Ceballos had been out "meeting some girls" near Maclay and San Fernando Road when they were shot. Ortega denied being at the homicide scene in Atwater, and did not know who shot him or why.

## III. Evidence Presented Only to Ceballos's Jury

When Officer Blandford interviewed Ceballos at the hospital, he believed that Ceballos was a gunshot victim. Ceballos told the officer that about a half an hour earlier he was walking on Osborne Street near Glenoaks when a car pulled to the curb next to him. A person in the car asked, "Where are you from?" Ceballos responded, "Toonerville." The car's passenger produced a handgun and shot Ceballos three times. The car fled, and a friend Ceballos did not identify gave him a ride to Pacifica Hospital. Ceballos did not appear to Officer Blandford to be cooperative. Officer Villagran went to

9

the area of Osborne Street where Ceballos claimed to have been shot and did not find evidence that there had been a shooting.

On February 17, 2008, Detective DiCroce interviewed Ceballos at the hospital. Ceballos stuck with part of his story, but added that he was with Ortega "meeting some girls" when he was shot.

Detective DiCroce arrested Ceballos on July 21, 2008. Detectives DiCroce and Lisa Governo interviewed Ceballos. A recording of the interview was played for the jury. In the interview Ceballos said that he was with Ortega[5] and "some girls" near Maclay and Foothill in Sylmar when he was shot. He said he lied at the hospital because his girlfriend was present. A man unknown to Ceballos drove him and Ortega to the hospital.

Detective DiCroce showed Ceballos a picture of the hat that had Ortega's DNA on it and said the hat was found at a homicide scene. He told Ceballos that he spoke with Ortega, that Ortega admitted that he was at the homicide scene, and that Ortega said that Ceballos was with him at the homicide scene. Ceballos said that Ortega told him to say they were together. Detective DiCroce said he did not believe Ceballos and advised him to tell the truth. Ceballos responded that he was on Osborn Street in Pacoima when he was shot. Ceballos did not know that he and Ortega were at the same hospital until Ortega called him a few days later.

Detective DiCroce expressed doubt that Ceballos and Ortega were shot in different parts of the city, that they were picked up by the same car and taken to the hospital, and that Ortega called Ceballos a few days later and asked him to say they were together when they were shot. Ceballos then admitted that he was "there" with Ortega, but denied that he had a gun. He said he drove Ortega and "Snoopy" to a location in the Rascals' neighborhood and parked. Ortega and Snoopy got out got out of the car. Ceballos heard

---

**5** Ceballos and the detectives refer to "Cesar" throughout the interview. Cesar is Ortega's first name. Ceballos does not contend that the references to "Cesar" were to someone other than Ortega. For consistency, we will use Ortega's last name. The parties stipulated that Ceballos's jury was not to consider the detectives' references to information obtained from Ortega as true but as "interrogation techniques."

shots. Ceballos determined that Ortega was shot and went to get him. While doing so, Ceballos was shot. Snoopy drove Ceballos and Ortega to Chevy Chase Park. Someone else got into the car and drove Ceballos and Ortega to the hospital. Ceballos did not know that Ortega and Snoopy were armed with guns or what their intentions were.

## DISCUSSION

### I. Sufficiency of Evidence in Support of Ortega's Murder Conviction

Ortega contends that there is insufficient evidence to support his murder conviction.[6] Sufficient evidence supports the conviction.

#### A. *Standard of Review*

"'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.]" (*People v. Avila* (2009) 46 Cal.4th 680, 701.) "We must presume in support of the judgment the existence of every fact that the trier of fact could reasonably deduce from the evidence. [Citation.]" (*People v. Medina* (2009) 46 Cal.4th 913, 919.) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict. [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) "In deciding the sufficiency of the evidence, a reviewing court resolves neither credibility issues nor evidentiary conflicts. [Citation.] Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact." (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)

---

**6** Ortega appears to confine his argument to his murder conviction. To the extent that his claim that there was no evidence that established that he was present at the murder scene or was a shooter was intended to apply to all of his convictions and sentence enhancements, our holding that there is sufficient evidence to support Ortega's murder conviction applies also to those other convictions and the sentence enhancements.

11

"Substantial evidence includes circumstantial evidence and the reasonable inferences flowing therefrom." (*People v. Ugalino* (2009) 174 Cal.App.4th 1060, 1064.) "We 'must accept logical inferences that the jury might have drawn from the circumstantial evidence. [Citation.]' [Citation]." (*People v. Zamudio, supra,* 43 Cal.4th at pp. 357–358.) "The standard of review is the same when the prosecution relies mainly on circumstantial evidence." (*People v. Valdez* (2004) 32 Cal.4th 73, 104.)

### B.    Application of Relevant Principles

Ortega contends that his murder conviction is not supported by sufficient evidence because the prosecution did not present an eyewitness who saw him with a gun, or saw him shoot Garcia or Ledezma, or even placed him at the scene of the murder. The only evidence that he was present, defendant contends, was his DNA on the hat that was found in the street. He apparently argues that we should disregard Lilburn's testimony because it was "seriously compromised" as she assisted the police by providing information about the "Valentine's Day" murder in an effort to help Clayborn in his murder prosecution and by her drug use that impaired her memory.

Sufficient evidence supports Ortega's conviction. Ortega was a member of the Toonerville gang. The Toonerville and Rascals gangs were rivals with a history of violent crimes against each other including assaults, shootings, and murders. According to Lilburn, hours before the murder, Ortega and other Toonerville gang members, including Ceballos, gathered at Ortega's apartment. At some point, Ortega and Ceballos, whom an eyewitness identified as one of the shooters, and the others discussed going to the Rascals gang's territory. Ortega asked Clayborn if he wanted to go to the Rascals gang's territory.

After Garcia left the bar at 2:00 a.m., he was shot at a location deep in the Rascals gang's territory. Ortega's blood was found at the scene of Garcia's murder. Ortega arrived at the Pacifica Hospital with a gunshot wound around 3:00 a.m. Ortega later admitted that he was with Ceballos when he was shot, although he claimed to have been

shot at Maclean Street and San Fernando Road. The police did not find any evidence that there had been a shooting at that location.

Ledezma testified that two men approached the passenger side of Garcia's car—Ceballos, who fired shots into the car, and a second man whom she got a good look at and whom she did not identify as Ortega. Ledezma and Hosie believed that Ceballos was armed with a semiautomatic handgun. Ceballos fired his handgun from the passenger side of the car. The ballistics evidence showed that Garcia was shot with a .38-caliber revolver from the driver's side of the car. Ledezma was shot in the left elbow with a bullet that was "most consistent" with a .38- or .357-caliber bullet and not a nine-millimeter bullet. A jury reasonably could conclude from such evidence that Ceballos and Ortega shot at Garcia from opposite sides of Garcia's car—Ceballos with a nine-millimeter semiautomatic handgun from the passenger side and Ortega with a .38-caliber revolver from the driver's side; that Ortega shot Garcia and Ledezma with a .38-caliber revolver; and that Ceballos and Ortega inadvertently shot each other in the process.

As for Ortega's challenge to Ledezma's credibility, her credibility was a matter for the jury to decide. (*People v. Jones* (1990) 51 Cal.3d 294, 314 ["Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.] Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder. [Citations.]"].)

## II.    Admission of Photographs

Defendants contend that the trial court erred in admitting photographs of them with Serna, a fellow Toonerville gang member, and the error violated their constitutional rights to freedom of association and to a fair trial. The photographs lacked relevance, defendants argue, "because the evidence failed to establish any nexus between Serna and the car, Serna and the guns found in the car or [defendants] and the guns, the car or

13

Serna's mother." Absent any such nexus, defendants reason, photographs that proved they were acquainted with Serna did not support any reasonable inference that either of them conveyed to Serna a gun used in the shooting or connected either of them to the gun at the time of the shooting.

"'""The rules pertaining to the admissibility of photographic evidence are well-settled. Only relevant evidence is admissible [citations], and all relevant evidence is admissible unless excluded under the federal or California Constitution or by statute. [Citations.] Relevant evidence is defined in Evidence Code section 210 as evidence 'having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.' The test of relevance is whether the evidence tends '"logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive. [Citations.]' [Citation.] The trial court has broad discretion in determining the relevance of evidence [citations] but lacks discretion to admit irrelevant evidence. [Citations.]" [Citation.]' [Citation.]" (*People v. Carter* (2005) 36 Cal.4th 1114, 1166–1167.) "A trial court's exercise of discretion in admitting or excluding evidence is reviewable for abuse [citation] and will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice [citation]." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.)

Even assuming that the trial court erred in admitting photographic evidence that demonstrated that Ceballos and Ortega knew Serna, any such error was harmless under either *Chapman v. California* (1967) 386 U.S. 18, 24 [harmless beyond a reasonable doubt standard] or *People v. Watson* (1956) 46 Cal.2d 818, 836 [reasonable probability of a more favorable result standard]. As to Ortega, the evidence showed that he was a member of the Toonerville gang, which gang had a violent rivalry with the Rascals gang. Hours before Garcia and Ledezma were shot, Ortega and Ceballos discussed going to Rascals gang territory. Garcia and Ledezma were shot at a location deep in the Rascals gang's territory. Ledezma identified Ceballos as one of the shooters and Ortega's blood was found at the scene. Around the time of Garcia's murder, Ortega and Ceballos went

14

to the Pacifica Hospital with gunshot wounds. Ortega told the police that he was shot at Maclean Street and San Fernando Road, but the police did not find any evidence that there had been a shooting at that location. Based on such evidence, it is beyond a reasonable doubt that Ortega's jury would have reached the same verdicts if the photographs of Ortega with Serna had been excluded.

It also is beyond a reasonable doubt that Ceballos's jury would have reached the same verdicts if the challenged photographic evidence had been excluded. As Ortega, the evidence showed that Ceballos was a member of the Toonerville gang; that the Toonerville gang had a violent rivalry with the Rascals gang; and that Garcia and Ledezma were shot at a location deep in the Rascals gang's territory. Ceballos admitted that he drove Ortega and "Snoopy" to a location in the Rascal's neighborhood and parked, and that he heard gunfire at that location. The evidence also firmly established Ceballos as one of the shooters. Ledezma, an eyewitness to the shooting, observed at close range the shooter who tapped on her window before reaching into Garcia's car and shooting Garcia. She identified Ceballos as that shooter. Ledezma's testimony alone was sufficient to support Ceballos's convictions. (*People v. Young*, *supra,* 34 Cal.4th at p. 1181 [the testimony of a single witness is sufficient to support a conviction unless it is physically impossible or inherently improbable]. ) Moreover, although he denied being a shooter, Ceballos admitted that he was with Ortega at the scene of the murder.

### III.  Sergeant Strasner's Testimony

Ortega contends that Sergeant Strasner's expert witness testimony about the predicate offenses for the section 186.22, subdivision (b)(1)(C) gang enhancement[7]—

---

[7]  "A criminal street gang is any ongoing association that has as one of its primary activities the commission of certain criminal offenses and engages through its members in a 'pattern of criminal gang activity.' (§ 186.22, subd. (f); see *People v. Loeun* (1997) 17 Cal.4th 1, 4 [69 Cal.Rptr.2d 776, 947 P.2d 1313].) A pattern of criminal gang activity is 'the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more' specified criminal offenses within a certain time frame, 'on separate occasions, or by two or more persons' (the

Evans's and Aguirre's prior convictions—was hearsay and its admission violated his constitutional right of confrontation. (U.S. Const., 6th Amend.; *Crawford v. Washington* (2004) 541 U.S. 36.) Ortega also appears to contend that there was insufficient evidence to support the gang enhancement because there was no evidence that he previously committed a crime for the benefit of the Toonerville gang or that he was an active member at the time of the offenses in this case. Ortega's claims fail.

The failure to object to the admission of evidence on hearsay or right of confrontation grounds in the trial court forfeits appellate review. (*People v. Bolin* (1998) 18 Cal.4th 297, 320 [hearsay claim]; *People v. Riccardi* (2012) 54 Cal.4th 758, 827, fn. 33 [Sixth Amendment confrontation clause claim].) Because Ortega did not object to the admission of Sergeant Strasner's testimony on hearsay or confrontation clause grounds, he has forfeited appellate review.

Defendant cites no authority for his apparent contention that there was insufficient evidence to support the gang enhancement under section 186.22, subdivision (b)(1)(C) because the enhancement may not be imposed absent proof that he previously committed an offense for the benefit of the gang. To the extent that defendant more specifically contends that a defendant charged under section 186.22, subdivision (b)(1)(C) must have committed a predicate offense within the meaning of the statute, he likewise cites no supporting authority. By its terms, section 186.22, subdivision (b)(1)(C)[8] does not

---

'predicate offenses'). (§ 186.22, subd. (e); see *Loeun,* at p. 4.)" (*People v. Tran* (2011) 51 Cal.4th 1040, 1044.)

[8]     Section 186.22, subdivision (b)(1)(C) provides:
"(b)(1) Except as provided in paragraphs (4) and (5), any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, shall, upon conviction of that felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished as follows:
"[¶-¶]
"(C) If the felony is a violent felony, as defined in subdivision (c) of Section 667.5, the person shall be punished by an additional term of 10 years."

16

require the prosecution to prove that a defendant committed a prior offense that benefitted the gang or that qualified as a predicate offense. Instead, prosecutors may prove predicate offense through crimes committed by gang members other than the defendant. (See *People v. Hill* (2011) 191 Cal.App.4th 1104, 1137-1138 & fn. 25 [evidence of crimes by eight gang members other than the defendant]; *People v. Tran, supra,* 51 Cal.4th at pp. 1044, 1046, 1050 [although a defendant's offense on a separate occasion may serve as a predicate offense for gang enhancement purposes, the trial court has the discretion to exclude evidence of such an offense under Evidence Code section 352].)

As for defendant's claim that the prosecution failed to adduce evidence demonstrating that he was a Toonerville gang member at the time the offenses were committed, "section 186.22 does not require that the defendant be an active or current member of the criminal street gang that benefits from his crime. [Citation.]" (*People v. Bragg* (2008) 161 Cal.App.4th 1385, 1402; see *People v. Valdez* (2012) 55 Cal.4th 82, 132 [a defendant's gang membership is "neither necessary nor sufficient to establish any element of the gang enhancement"].) Accordingly, defendant's claim of insufficient evidence is unavailing.

## IV. Ceballos's Section 186.22, Subdivision (b)(1)(A) Gang Enhancement on His Assault With a Semiautomatic Firearm Conviction

The jury found Ceballos guilty of assault with a semiautomatic firearm and found true the accompanying gang enhancement allegation under section 186.22, subdivision (b). The trial court imposed a four-year term for the gang enhancement. (§186.22, subd. (b)(1)(A).) Ceballos contends that under section 12022.53, subdivision (e)(2)[9], the

---

**9**     Section 12022.53, subdivision (e) provides:
        "(e)(1) The enhancements provided in this section shall apply to any person who is a principal in the commission of an offense if both of the following are pled and proved:
        "(A) The person violated subdivision (b) of Section 186.22.
        "(B) Any principal in the offense committed any act specified in subdivision (b), (c), or (d).

imposition of the 25 years to life section 12022.53, subdivisions (d) and (e)(1) enhancements on his convictions for murder and shooting at an occupied motor vehicle (stayed pursuant to section 654) precluded imposition of the four-year gang enhancement on his assault with a semiautomatic firearm conviction. We disagree.

We review the construction of a statute de novo. (*Regents of University of California v. Superior Court* (1999) 20 Cal.4th 509, 531.) "'In construing a statute, our role is to ascertain the Legislature's intent so as to effectuate the purpose of the law. [Citation.] In determining intent, we must look first to the words of the statute because they are the most reliable indicator of legislative intent. [Citation.] If the statutory language is clear and unambiguous, the plain meaning of the statute governs. [Citation.]' (*People v. Lopez* (2003) 31 Cal.4th 1051, 1056 [6 Cal.Rptr.3d 432, 79 P.3d 548].) In other words, if there is 'no ambiguity or uncertainty in the language, the Legislature is presumed to have meant what it said,' and it is not necessary to 'resort to legislative history to determine the statute's true meaning.' (*People v. Cochran* (2002) 28 Cal.4th 396, 400–401 [121 Cal.Rptr.2d 595, 48 P.3d 1148].)" (*People v. Licas* (2007) 41 Cal.4th 362, 367.) "We begin by examining the statute's words, giving them a plain and commonsense meaning." (*People v. Murphy* (2001) 25 Cal.4th 136, 142.) "[W]hen a statute defining a crime or punishment is susceptible of two reasonable interpretations, the appellate court should ordinarily adopt that interpretation more favorable to the defendant. [Citations.]" (*People v. Avery* (2002) 27 Cal.4th 49, 57.)

Ceballos contends that the phrase "in the commission of the offense" in subdivision (e)(2) of section 12022.53 is not clear and unambiguous and thus requires judicial interpretation. He argues that the phrase should be interpreted broadly to preclude imposition of a section 186.22 gang enhancement when a section 12022.53 enhancement based on a principal's firearm use or discharge has been imposed on

"(2) An enhancement for participation in a criminal street gang pursuant to Chapter 11 (commencing with Section 186.20) of Title 7 of Part 1 shall not be imposed on a person in addition to an enhancement imposed pursuant to this subdivision, unless the person personally used or personally discharged a firearm in the commission of the offense."

another conviction that was part of a continuous transaction. Accordingly, Ceballos argues, because the sentence enhancements under section 12022.53, subdivision (d) and (e)(1) on his murder and shooting at an occupied motor vehicle convictions were based on a principal's use of a firearm as part of a continuing transaction and not on a finding that he personally used or discharged a firearm, the section 186.22 gang enhancement on his assault with a semiautomatic firearm conviction must be stricken.

The trial court properly enhanced Ceballos's sentence under section 186.22 on his assault with a semiautomatic firearm conviction. Subdivision (e)(2) of section 12022.53 precludes imposition of a section 186.22 gang enhancement in addition to a section 12022.53 enhancement unless the defendant was found to have "personally used or personally discharged a firearm in the commission of the offense."[10] The phrase "in the commission of the offense" is clear and unambiguous and plainly bars multiple sentence enhancements—i.e, sentence enhancements under sections 12022.53 and 186.22—on the *same* offense. Accordingly, because the sentence for Ceballos's assault with a semiautomatic firearm conviction was not and could not be enhanced under section 12022.53 because it was not an enumerated offense under subdivision (a), the multiple sentence enhancement bar in subdivision (e)(2) necessarily did not preclude the trial court from enhancing Ceballos's sentence under section 186.22.

V.     **Defendants' Section 12022.53, Subdivisions (b) and (e)(1) and (c) and (e)(1) Enhancements for Their Shooting at an Occupied Motor Vehicle Convictions**

As to defendants' convictions for shooting at an occupied motor vehicle, the jury found true the allegations that a principal personally used a firearm (§ 12022.53, subds. (b) & (e)(1)), personally discharged a firearm (§ 12022.53, subds. (c) & (e)(1)), and personally discharged a firearm proximately causing great bodily injury or death (§12022.53, subds. (d) & (e)(1)). The trial court trial court imposed each of the sentence

---

**10**     The offenses to which the section 12022.53 enhancements apply are enumerated in subdivision (a) of that section. Assault with a semiautomatic firearm (§ 245, subd. (b)) is not an enumerated offense.

19

enhancements.  Pursuant to *People v. Gonzalez* (2008) 43 Cal.4th 1118, 1129-1130, the trial court stayed the sentence on the section 12022.53, subdivisions (b) and (e)(1) and (c) and (e)(1) enhancements, and, pursuant to section 654, stayed the sentences on defendants' convictions for shooting at an occupied motor vehicle, including the enhancements under subdivision (d) and (e)(1).

Defendants contend that the sentence enhancements under section 12022.53, subdivisions (b) and (e)(1) and (c) and (e)(1) must be stricken and not stayed because they were not charged in the information and because shooting at an occupied motor vehicle (§ 246) is not one of the enumerated offenses under section 12022.53, subdivision (a), to which the subdivisions (b) and (e)(1) and (c) and (e)(1) enhancements apply. Respondent agrees, as do we, that the challenged enhancements must be stricken as section 12022.53, subdivisions (b) and (e)(1) and (c) and (e)(1) do not apply to violations of section 246.[11]  (§ 12022.53, subd. (a).)


## VI.    Custody Credits

Laudably, respondent has identified sentencing errors that benefit defendants. Respondent states that the trial court erred in awarding Ceballos 1,323 days rather than 1,325 days of custody credit, and in awarding Ortega 1,295 days rather than 1,301 days of custody credit.  We agree and order defendants' abstracts of judgment modified accordingly.

A defendant is entitled to credit for all days in custody commencing with the day of arrest (*People v. Taylor* (2004) 119 Cal.App.4th 628, 645) and including partial days and the day of sentencing (*People v. Browning* (1991) 233 Cal.App.3d 1410, 1412; *People v. Fugate* (1990) 219 Cal.App.3d 1408, 1414).  Ceballos was arrested on July 21, 2008, and sentenced on March 6, 2012, a period of 1,325 days.  The trial court

---

[11]    Because we hold that the challenged enhancements must be stricken as subdivisions (b) and (e)(1) and (c) and (e)(1) do not apply to violations of section 246, we need not reach the issue of whether the enhancements must be stricken because they were not specifically alleged in the information with respect to the shooting at an occupied motor vehicle count.

erroneously awarded Ceballos 1,323 days of custody credit. Ortega was arrested on August 14, 2008, and sentenced on March 6, 2012, a period of 1,301 days. The trial court erroneously awarded Ortega 1,295 days of custody credit. We order Ceballos's abstract of judgment modified to reflect 1,325 days of custody credit, and Ortega's abstract of judgment modified to reflect 1,301 days of custody credit.

## DISPOSITION

Ceballos's abstract of judgment is ordered modified by striking the section 12022.53, subdivisions (b) and (e)(1) and (c) and (e)(1) sentence enhancements on his shooting at an occupied vehicle conviction (§ 246), and by reflecting an award of 1,325 days of custody credit. Ortega's abstract of judgment is ordered modified by striking the section 12022.53, subdivisions (b) and (e)(1) and (c) and (e)(1) sentence enhancements on his shooting at an occupied vehicle conviction (§ 246), and by reflecting an award of 1,301 days of custody credit. The judgments otherwise are affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


MOSK, J.


We concur:



TURNER, P. J.



KRIEGLER, J.


21